Albert C. WALKER; Roberta Walker, Leon Ilnicki; Juanita Ilnicki, John C. Soso; Jacklyn C. Soso; Margaret Smith, Alyce Crosdale, and Betty Sands, Plaintiffs,

v.

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, City and County of San Francisco, State of California; Board of Education of the San Francisco Unified School District, City and County of San Francisco, State of California; Ramon Cortines, Superintendent of Schools, San Francisco Unified School District; William Honig, as California Superintendent of Public Instruction; California Department of Education; California State Board of Education;

John R. Quinn, Archbishop of the Archdiocese of San Francisco, individually and as a Corporation Sole; Archdiocese of San Francisco; Lauro F. Cavazos, as Secretary of the United States Department of Education, Defendants,

and

Deborah Martin; Jacob Perea; and Barbara Perea, Intervenor–Defendants.

No. C–86–6430 WHO.

United States District Court, N.D. California.

April 1, 1991.

**1465**

Claude Morgan, Sacramento, Cal., Lee Boothby, Boothby, Ziprick & Yingst, Berrien Springs, Mich., for plaintiffs.

Louise H. Renne, City Atty., Dennis Aftergut, Burk E. Delventhal, Randy Riddle, Deputy City Attys., San Francisco, Cal., for defendants San Francisco Unified School Dist. and Ramon Cortines.

Roger Wolfertz, Legal Office, State Dept. of Ed., Sacramento, Cal., for State defendants.

Paul E. Gaspari, Lawrence R. Jannuzzi, Tobin & Tobin, San Francisco, Cal., for The Roman Catholic Archbishop of San Francisco.

Stuart M. Gerson, Asst. Atty. Gen., Joseph P. Russoniello, U.S. Atty., Stephen Schirle, Asst. U.S. Atty., San Francisco,

Cal., Brook Hedge, Theodore C. Hirt, Eric J. Segall, Attorneys, Civ. Div., Dept. of Justice, Washington, D.C., for U.S. Dept. of Educ. and Lauro F. Cavazos, Secretary.

Charles H. Wilson, Laura P. Masurovsky, William & Connolly, Washington, D.C., Gregory Ryken, Jacobs, Spotswood & Ryken, San Francisco, Cal., for intervenor-defendants.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiffs, resident California state and federal taxpayers, filed a declaratory relief action against defendants [1] alleging that the manner in which remedial educational services are provided to students attending sectarian schools in the San Francisco Unified School District, pursuant to Chapters 1 and 2 of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. §§ 3801 *et seq.*,[2] violates the Establishment Clause of the First Amendment to the Constitution of the United States.

On June 6, 1990, this Court issued an Opinion and Order granting defendants' motion for summary judgment with respect to all causes of action challenging the constitutionality of Chapter 2. *Walker v. San Francisco Unified School Dist.*, 741 F.Supp. 1386 (N.D.Cal.1990).

Defendants have filed a motion for summary judgment contending that they are

1. Defendants San Francisco Unified School District, Board of Education of the San Francisco Unified School District, Ramon Cortines, Superintendent of Schools, San Francisco Unified School District, William Honig, California Superintendent of Public Instruction, California Department of Education, and California State Board of Education are the state and local educational agencies and titular authorities responsible for implementing Chapters 1 and 2 of the Education Consolidation and Improvement Act of 1981 ("ECIA") in San Francisco. Lauro F. Cavazos, Secretary of the United States Department of Education, is titular authority of the federal educational agency responsible for implementing the ECIA. Defendant John R. Quinn, Archbishop of the Archdiocese of San Francisco, is titular authority of the Archdiocese of San Francisco, some of whose sectarian school students are recipients of ECIA funds. Intervenor-defendants, Deborah Martin, Jacob Perea, and Barbara Perea, are parents of chil-

2. Chapter 1 of the ECIA superceded Title I of the Elementary and Secondary Education Act of 1965. 20 U.S.C. § 2701 *et seq.* Chapter 2 of the ECIA consolidated a number of federal educational programs into a single "block grant" to the various states eligible for funds. 20 U.S.C. § 3811(a).

Effective April 28, 1988, Chapters 1 and 2 were superceded by Title I of the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988, Pub.L. 100–297, 102 Stat. 140 (1988), 20 U.S.C. § 2701 *et seq.*, which reauthorized Chapters 1 and 2. Because all of the pleadings in this case and the evidence in the record identify the programs as "Chapter 1" and "Chapter 2," those designations will be used in this Opinion and Order for sake of clarity.

entitled to judgment as a matter of law with respect to Chapter 1. After consideration of the pleadings and oral argument of counsel, the Court, for the reasons set forth herein, grants defendants' motion in part and denies it in part.

### I.

Chapter 1 provides funds for remedial education services to educationally deprived children who reside in low-income areas regardless of whether they attend public, private nonsectarian, or private sectarian schools. Under Chapter 1, Congress provides financial assistance in the form of grants to local educational agencies to meet the special needs of educationally deprived children at the preschool, elementary, and secondary school levels from areas where low-income families are concentrated.

The local educational agency ("LEA") applying for such a grant must provide assurance to the Secretary of the United States Department of Education ("Secretary") that it will provide the necessary services to children attending both public and private schools on an equal basis. In developing specific programs, the LEA is required to consult with appropriate private school representatives to ensure proper implementation of the program. 20 U.S.C. § 2727(a). The final decision, however, rests solely with the LEA.

The funds used for Chapter 1 may not be used to meet the "needs of the private school" or the "general needs of children in the private school." 34 C.F.R. § 200.53(b). Additionally, Chapter 1 funds may be used only for services that supplement, and in no way supplant, services that otherwise would be provided from nongovernmental sources.

Prior to 1985, the San Francisco Unified School District ("District") provided Chapter 1 services to children attending private sectarian schools in classrooms located on the campuses of the religious schools. In 1985, in the case of *Aguilar v. Felton*, 473

U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), the Supreme Court held that this practice violates the Establishment Clause of the First Amendment.

In response to *Aguilar*, the District sought alternative ways to provide Chapter 1 services to children attending sectarian schools without running afoul of the First Amendment. After much debate and consultation among the District and religious school officials[3], the District began providing Chapter 1 services to religious school children in mobile vans that the District purchased specifically for the purpose of providing Chapter 1 services to children attending sectarian schools.

In providing Chapter 1 services to religious school children, the District, in all but a few instances, parks the vans on public property or private property unaffiliated with the religious institution whose children are receiving the services at the time. Defendants' Memorandum in Support of Motion for Summary Judgment on Chapter 1, filed Aug. 24, 1990, Exh. B, Declaration of Junius Camp ("Camp Declaration"). In four instances, however, due to safety concerns or the unavailability of nearby parking locations, the mobile units are parked on private school property. Camp Declaration at ¶ 5.

It is undisputed that the mobile classrooms are under the complete control of the District and are used solely to provide Chapter 1 services. None of the classrooms contain any religious symbols, and all are clearly marked as property of the District. In addition, the teachers providing the remedial services are employees of the District and teach only secular subjects such as remedial reading and mathematics.

As noted above, funding for Chapter 1 services is provided by the federal government. Pursuant to regulations promulgated by the Secretary, all reasonable and necessary administrative costs of providing Chapter 1 services to both public and pri-

---

**3.** Plaintiffs devote some seventeen pages of their brief to chronicling the discussions and planning activities surrounding the implementation of the current program for providing Chapter 1 services to children attending sectarian schools.

The Court has intentionally omitted much discussion of these facts at this point, and instead, will discuss them in greater detail in its discussion of plaintiffs' excessive entanglement argument.

vate schools are taken "off-the-top" of the entire allocation. 34 C.F.R. § 200.52(a)(2). In attempting to comply with this regulation, the District classifies the cost of purchasing the mobile units as administrative costs and deducts the cost "off-the-top" of the entire allocation.

Plaintiffs' objections to the current Chapter 1 program can be broken down into the following distinct complaints: (1) placing mobile classrooms adjacent to parochial school property has the primary effect of aiding religion because it creates a "symbolic union" of church and state, provides a direct benefit to the parochial schools, or results in excessive entanglements between church and state; (2) placing the mobile classrooms on religious school property creates the primary effect of aiding religion either because it creates a "symbolic union" of church and state or because it results in excessive entanglements between church and state; (3) the "off-the-top" allocation of the costs of the mobile classrooms results in an inequitable benefit to those children attending parochial schools to the detriment of those children attending public schools; (4) the equal expenditure provision, the by-pass provision and the requirement that the LEA consult with private school officials in implementing any program, give the religious school officials an impermissible "veto" power over the implementation of Chapter 1; (5) the above requirements unconstitutionally lead to an excessive entanglement between church and state; and (6) the leasing of property from religious organizations to provide Chapter 1 services constitutes impermissible direct aid to religion and also leads to excessive entanglement between church and state. The Court will discuss each of these contentions in turn.

## II.

■ In determining whether a statute or governmental practice violates the Establishment Clause, the starting point is the three-prong test first enunciated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To be permissible under this test, the law or practice in question must (1) have a secular purpose, (2) have a primary or principal effect that neither advances nor inhibits religion, and (3) not foster excessive entanglements with religion. *Id.* at 612–13, 91 S.Ct. at 2111. For the reasons discussed *infra,* applying this test to the facts of this case leads the Court to conclude that the challenged implementation of Chapter 1 passes constitutional muster in all but two respects.[4]

### A.

■ There is no question that Chapter 1 seeks to accomplish a valid secular purpose. The stated purpose of Chapter 1 is "to improve the educational opportunities of educationally deprived children by helping such children succeed in the regular program of the local educational agency, attain grade-level proficiency, and improve achievement in basic and more advanced skills." 20 U.S.C. § 2701(b). This clearly is a sufficiently secular purpose to satisfy the purpose prong of the *Lemon* test. Indeed, plaintiffs do not argue otherwise.

### B.

■ In their complaint, plaintiffs allege that using mobile classrooms parked in close proximity to the parochial schools "has the effect of directly promoting religion and substantially advancing the primary religious mission of the sectarian schools." Plaintiffs' Second Amended Complaint, filed Nov. 17, 1987, at ¶ 43. Plaintiffs' argument is premised on what it considers to be a "symbolic union" between church and state that arises out of the close proximity between the parochial schools and the location of the mobile classrooms. For the reasons discussed below, the Court finds this argument unpersuasive and contrary to relevant Supreme Court precedent.

As support for their position, plaintiffs rely heavily on *School District of the City*

---

4. The way in which plaintiffs have framed their complaint does not easily lend itself to a discussion within the framework of the three-prong *Lemon* test. Therefore, with the exception of the "purpose" prong, about which there is no debate, rather than discuss each factor *seriatim,* the Court will discuss each challenged practice in turn and apply the factors accordingly.

of *Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1984). In *Grand Rapids,* the Court, among other things, invalidated a program that allowed public school teachers to teach certain courses in the parochial schools. The Court found the program unconstitutional because it had the effect of promoting religion in three ways. First, the Court found that "[t]he state-paid instructors, influenced by the pervasively sectarian nature of the religious schools in which they work, may subtly or overtly indoctrinate the students in particular religious tenets at public expense." *Id.* at 397, 105 S.Ct. at 3230. Second, the Court held that "[t]he symbolic union of church and state inherent in the provision of secular, state-provided instruction in the religious school buildings threatens to convey a message of state support for religion to students and to the general public." *Id.* Third, the Court found that "the programs in effect subsidize the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects." *Id.* As the Court will show, however, none of these factors are present in the case at bar.

The first way in which the Court felt that the program in *Grand Rapids* had the effect of promoting religion was the danger that state-paid instructors, having been influenced by the pervasively sectarian nature of the religious schools in which they work, would inculcate religious beliefs in their students. The rationale behind this holding was the Court's belief that "[t]eachers in such a [pervasively sectarian] atmosphere may well subtly (or overtly) conform their instruction to the environment in which they teach, while students will perceive the instruction provided in the context of the dominantly religious message of the institution, thus reinforcing the indoctrinating effect." *Id.* at 388, 105 S.Ct. at 3225.

Here, however, the remedial services being offered under Chapter 1 are not being conducted in a pervasively sectarian atmosphere. Instead of teaching in the religious school classrooms, a practice found unconstitutional in *Aguilar,* the classes are being taught in classrooms owned and op-

erated by the public schools. The Court upheld a similar practice in *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1976).

In *Wolman v. Walter,* the Court upheld a state statute that provided therapeutic, guidance, and remedial services for students identified as having a need for specialized attention. These services were to be provided in the public schools, in public centers, *or in mobile units located off the nonpublic premises. Id.* at 244 n. 12, 97 S.Ct. at 2604 n. 12. The Court found nothing impermissible in this practice so long as the services were provided at sites that were " 'neither physically nor educationally identified with the functions of the nonpublic school.' " *Id.* at 246–47, 97 S.Ct. at 2604–05 (quoting *Wolman v. Essex,* 417 F.Supp. 1113, 1123 (N.D.Ohio 1976)). The Court upheld this practice even though previously it had struck down a statute that provided identical services, albeit in the nonpublic schools.

Plaintiffs, while not disputing the applicable legal standard, argue that a genuine issue of fact exists as to whether the mobile units are truly neutral sites. To support their position that the mobile units are not religiously neutral sites, plaintiffs present evidence that Chapter 1 teachers can and do use the parochial school's lounge and lunchroom, (Deposition Excerpts Supporting Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Chapter 1 ("Deposition Excerpts"), filed Sept. 24, 1990, Camp Deposition at 178–79), attend faculty meetings, (Deposition Excerpts, Morrisey Deposition at 33; Fagan Deposition at 200–01), and on occasion visit Chapter 1 students in their regular classrooms (Morrisey deposition at 35–36).

This, without more, is insufficient to create a genuine issue of material fact under the standards announced in the Supreme Court trilogy of *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Libberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477

U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under the views espoused in these cases, when the moving party has identified evidence that shows the absence of a genuine issue of material fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356.

As noted *supra* (page 1466, right column, lines 32–38), and repeated for emphasis, the vans are owned by the District, are clearly identified as property of the District, contain no religious symbols whatsoever and, with four exceptions, are not located on parochial school property. Furthermore, the vans are used only to provide Chapter 1 remedial services, and are in no way used by the parochial schools themselves. Finally, classes taught in the vans are taught solely by public school teachers. Based on the totality of these circumstances, the Court concludes that there can be no doubt that the mobile units not located on parochial school property are sufficiently neutral sites to satisfy the standard enunciated in *Wolman v. Walter.*

In reaching this conclusion, the Court notes that the only published case reaching this issue, *Pulido v. Cavazos*, 728 F.Supp. 574 (W.D.Mo.1989), held that mobile units parked off the religious school property *are* religiously neutral sites and that their use is constitutional.

In *Pulido*, the court, after noting that it was drawing lines that many would conclude need not exist, drew a distinction between mobile units located on religious school property and those located just off the property. The court found that placing the mobile classrooms on parochial school property was unconstitutional while placing the vans immediately adjacent to the property was permissible, despite the fact that at some schools the vans located off the property were physically closer to the religious school buildings than those at other schools that were actually on school property. *Id.* at 592.

The above notwithstanding, plaintiffs next argue that placing mobile classrooms in the vicinity of the parochial schools leads to an impermissible "symbolic union" between church and state.

In determining whether the challenged practice in *Grand Rapids* created a symbolic connection between church and state, the Court noted that because the religious school students spent their typical school day moving between religious school and "public school" classes, both of which were taught in the same building, "the students would be unlikely to discern the crucial difference between the religious school classes and the 'public school' classes, even if the latter were successfully kept free of religious indoctrination." 473 U.S. at 391, 105 S.Ct. at 3226.

In this case, however, the religious classes and the Chapter 1 classes are not taught in the same building. In fact, to get to those classes being taught in mobile units located off the parochial school campuses, the students must physically leave the campus, albeit in many instances by only a short distance. This factor makes it likely that the students and public at large will "discern the crucial difference between the religious school classes and the 'public school' classes...." *Id.* Once again, the Court notes that the *Pulido* court reached this same result. Therefore, the Court finds that utilizing mobile classrooms located off the parochial school grounds does not create an impermissible symbolic union between church and state.

Plaintiffs' final argument with respect to the provision of Chapter 1 services in mobile vans is that providing mobile classrooms for use by parochial school children has the primary effect of advancing religion because the program subsidizes the religious functions of the parochial schools. This argument has no merit.

In *Grand Rapids*, the Court noted that in the past the Court had distinguished between two categories of programs in which public funds were used to finance secular activities that the parochial schools would have been forced to finance themselves. In the first category, the Court has upheld laws that only indirectly or incidentally benefited the parochial schools. In the second category of cases, the Court has

struck down laws that provided direct and substantial advancement of the parochial schools.

In both *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) and *Wolman v. Walter*, the Court held unconstitutional state programs providing loans of instructional materials and equipment to parochial schools on the ground that "the programs advanced the 'primary, religion-oriented educational function of the sectarian school.'" *Grand Rapids*, 473 U.S. at 395, 105 S.Ct. at 3228 (quoting *Meek*, 421 U.S. at 364, 95 S.Ct. at 1762). The Court in *Grand Rapids* went on to hold that providing educational services to parochial schools fell into category two and constituted an impermissible direct subsidy.

Here, defendants argue that providing Chapter 1 services to parochial schools does not constitute direct aid because the funds expended are used to finance secular activities that the religious schools would not otherwise fund themselves. While the Court in *Grand Rapids* rejected a similar argument, differences in the two programs at issue lead this Court to conclude that defendants are correct.

In *Grand Rapids*, the Court's rejection of an argument similar to the one proffered by defendants here was based on three factors. First, the Court felt that there was no way of knowing whether the religious schools would have provided some or all of the courses offered in the challenged program. Second, although the precise subjects may have been new to the participating schools, their general subject matter was undoubtedly a part of the curriculum in the past. Third, the Court felt that accepting defendants' argument would permit the public schools gradually to take over the entire secular curriculum of the religious schools. *Id.* at 395–96, 105 S.Ct. at 3228–29. It was this last factor that the Court felt was most important.

Here, Chapter 1 services are not the type that ordinarily would be provided by the religious schools. Although the services are educational in nature, they are provided only to those children that have special educational needs and come from impoverished families. In this respect, the services are more akin to the type of general welfare services that the Supreme Court has allowed to be provided to parochial school children. *See, Wolman v. Walter*, 433 U.S. at 244–246, 97 S.Ct. at 2603–05. Furthermore, by the express terms of Chapter 1, Chapter 1 money is not to be used to supplant services that otherwise are available from nonfederal sources. 20 U.S.C. § 2728(b); 34 C.F.R. §§ 200.44, 200.-53(a). The Court, therefore, finds, as did the court in *Pulido* that the use of mobile classrooms to provide Chapter 1 services to parochial school children confers only an incidental benefit on the parochial schools and does not have the primary effect of aiding religion.

### C.

■ Plaintiffs next challenge the Districts's attempt to implement Chapter 1 by providing services to children attending sectarian schools in vans parked on parochial school property. As noted above, because of logistical or safety problems in locating the vans on public property immediately adjacent to the parochial schools, the District was forced to place the vans on the grounds of the parochial schools in four instances. With the exception of a few crucial differences, the analysis of this issue is identical to the one just completed with respect to the provision of Chapter 1 services in vans located immediately adjacent to parochial schools. The crucial question is whether the fact that the mobile classroom is parked on religious property makes the classroom a less neutral site or creates a stronger symbolic link between church and state than does parking the vans on public property immediately adjacent to the parochial school.

In finding that placing the mobile classrooms on religious school grounds does create an impermissible symbolic union between church and state, the Court notes, as Judge Stevens did in *Pulido*, that "[w]hile the risk of people perceiving a link between the private schools and the mobile units may be less than when services were provided inside the parochial schools themselves, students receiving [Chapter 1] services are still receiving those services on

private school grounds." 728 F.Supp. at 591. Furthermore, it is doubtful that an elementary school child who merely goes from one building on campus to another would "discern the crucial difference between the religious school classes and the 'public school classes' even if the latter were successfully kept free of religious indoctrination." *Grand Rapids*, 473 U.S. at 391, 105 S.Ct. at 3226. Also, the public at large might easily conclude from the presence of District property on religious school grounds that the two are engaged in a cooperative effort.

As noted above, Judge Stevens in *Pulido* opted for a bright line rule in deciding that whether the mobile classroom was parked on or off campus was dispositive. While to some this might seem an arbitrary exercise of judicial line-drawing, the Court believes, as did Judge Stevens, that this method is much preferred to the alternative. For drawing the distinction at the property line of the school campus alleviates the necessity of the Court having to engage in the even more arbitrary exercise of having to determine just how far from the private school campus the vans have to be located in order to be considered a neutral site. There is enough uncertainty prevalent in this area of the law without adding to that uncertainty by having to determine how far is far enough. Furthermore, the decision to draw the line at the property boundary finds some support in dictum contained in Justice O'Connor's dissent in *Aguilar*. In her dissent, Justice O'Connor stated that "children who attend parochial schools may also continue to benefit from Title I programs offered off the premises of their schools—possibly in portable classrooms just over the edge of school property." 473 U.S. at 430–31, 105 S.Ct. at 3247 (O'Connor, J., dissenting).

Therefore, the Court finds that placing the mobile classrooms on private school property violates the Establishment Clause. Because plaintiffs have not filed a cross-motion for summary judgment, however, all the Court can do now is deny defendants' motion on this issue.

## D.

Plaintiffs next challenge the District's practice of taking the cost of obtaining the mobile classrooms "off the top" of its entire Chapter 1 budget, a practice required under the regulations promulgated by the Secretary. Plaintiffs allege that this practice violates the Establishment Clause by providing more money to the parochial school children than to the public school children when the expenditures are compared on a per child basis. Plaintiffs note that *Pulido*, the only published case to decide this issue, found the "off-the-top" allocation system unconstitutional. But for the reasons discussed below, the Court declines to follow *Pulido*, and reaches the opposite conclusion, i.e., that taking the expenses of providing the mobile vans "off the top" is fully constitutional.

There is no question that the practice of deducting the costs of the mobile units off the top of all monies allocated for Chapter 1 services has the effect of decreasing the amount of services the children in the programs receive. Many courts, however, have held that the Constitution does not require absolute equality of expenditures between public and parochial schools. *See, Members of Jamestown School Committee v. Schmidt*, 699 F.2d 1, 9 (1st Cir.1983). So long as the costs are not so disproportionate as to become apparent that the program is merely a ruse to confer a benefit to the parochial school children, the program will not be struck down merely because the costs of administering the program do not fall equally on all parties. *Id.* at 10.

The major problem with plaintiffs' argument is that they erroneously focus on the provision of the mobile classrooms as the benefit of the Chapter 1 program, rather than on the true benefit, which is remedial education services being provided to poor children who are in desperate need of such services. The mobile classrooms are just a means of providing these services. In fact, if the costs of the mobile units were deducted only from the portion of funds earmarked for children attending parochial schools, those children would be receiving substantially less "educational" services

than were the children in the public schools. This would then be in violation of Chapter 1 itself, which requires that the *services* available to children be comparable, a provision explicitly upheld in *Wheeler v. Barrera,* 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1973).

Furthermore, when the Court compares the expenditures made in acquiring the mobile units with total expenditures for the entire Chapter 1 program, the Court is hard pressed to conclude that the program is just a ruse to confer a benefit on the parochial schools.

In the 1986–87 school year, the District spent approximately $368,000 in acquiring seven mobile classrooms, while the overall expenditures on Chapter 1 services were in excess of $6 million. Thus, only a little over five percent of the entire budget was spent on acquiring mobile classrooms. Not surprisingly, this percentage has dwindled even further in recent years as the need to acquire mobile vans has lessened. In fact, in the past two school years the District did not purchase any new vans. The only expenses incurred in conjunction with the mobile classrooms was some $82,000 for maintenance, while the combined expenditures for the overall program for these years was nearly $15 million. Therefore, while it is true that it costs more to administer Chapter 1 services to children attending parochial schools, given these numbers, the Court concludes that the disparity is not so great as to constitute a ruse to provide a direct benefit to the parochial schools.

The Court recognizes that this conclusion is contrary to the conclusion reached in *Pulido.* But, as the Court will attempt to show, it believes the *Pulido* decision was incorrectly decided.

In finding the off-the-top method of allocating funds for the purchase of the mobile classrooms unconstitutional, Judge Stevens concluded in *Pulido* that:

> While it is constitutional to use public funds to provide for the remedial education of public school students the Constitution does not require, and indeed this court finds that it forbids, the taking of federal funds from public school stu-

dents in order to allow the services to be provided to private school students.

728 F.Supp. at 586–87. There is one inconsistency in this conclusion, however, that leads this Court to reject it.

When read literally, Judge Stevens opinion would necessarily bar the government from using any federal funds to finance Chapter 1 services in parochial schools, a proposition implicitly rejected in *Wheeler.* The last clause of the quoted passage states that the Constitution prohibits "the taking of federal funds from public school students in order to allow the services to be provided to private school students." *Pulido,* 728 F.Supp. at 587. The fallacy in this argument is that any federal money spent on providing services to parochial school children necessarily takes funds away from children attending public schools. Even if the costs of the vans were deducted only from funds earmarked for parochial school children, a proposition that would arguably violate the comparable services provision of Chapter 1, the effect is still using federal funds to provide remedial services to parochial school children. Yet Judge Stevens himself upheld the practice of providing services to parochial school children through the use of mobile classrooms parked off the premises of the parochial schools.

For the reasons discussed above, the Court parts company with Judge Stevens and finds that taking the costs of providing Chapter 1 services to parochial school children through the use of mobile vans "off the top" is fully constitutional.

### E.

■ In their complaint, plaintiffs allege that the by-pass provision, the equal expenditure provision, and the requirement that the LEA and the private school officials consult each other in implementing any Chapter 1 program combine to give the religious officials an impermissible "veto" over implementation of the program. Plaintiffs further allege that the religious officials used this "veto" power to gain the type of program they desired. Defendants counter that while the by-pass provision

and the consultation requirement do give the religious school officials a say in implementing the Chapter 1 program, the provisions in no way give the religious school officials any power to veto the program.

Plaintiffs' contention was expressly rejected in *Wheeler*, where the Court noted that:

[T]he Act places ultimate responsibility and control with the public agency, and the overall program is not to be defeated simply because the private school refuses to participate unless the aid is offered in the particular form it requests. The private school may refuse to participate if the local program does not meet with its approval. But the result of this would then be that the private school's eligible children, the direct and intended beneficiaries of the Act, would lose. The Act, however, *does not give the private school a veto power over the program selected by the local agency.*

417 U.S. at 424, 94 S.Ct. at 2286–87 (emphasis added). The only difference between Chapter 1 before the *Wheeler* Court and Chapter 1 before this Court relevant to this discussion is that the original Act did not contain a by-pass provision. The by-pass provision, however, does not shift responsibility over the program to the religious school officials.

The by-pass provision, 20 U.S.C. § 2727(b), provides generally that if the Secretary determines that an LEA has failed to provide services to private school children in an equitable manner, then arrangements must be made to have such services furnished in the proper manner. It is difficult to conceive how this provision, which vests final decision making authority in the Secretary, can be read to grant to the religious schools a "veto" over implementation of the Chapter 1 program. Therefore, the Court concludes that the decision in *Wheeler*, that Chapter 1 does not give the private school a veto over the program, retains its vitality.

### F.

As an adjunct to their veto argument, plaintiffs contend that the procedures set forth in Chapter 1 for implementing the program have led to political divi-

siveness along religious lines and have created excessive entanglements between church and state. In fact, plaintiffs spend some seventeen pages of their factual recitation, and submit some 125 exhibits, chronicling the efforts undertaken by all parties to implement the present Chapter 1 program.

As noted in *Lemon*, a law is deemed to foster excessive entanglements if it requires comprehensive, discriminating, and continuing state surveillance to ensure that the principles embodied in the Establishment Clause are respected. 403 U.S. at 619, 91 S.Ct. at 2114. Here, the initial decision on how to implement the Chapter 1 program undoubtedly involved a great deal of entanglement between church and state. But these entanglements were the result of the unusual circumstances present in trying to develop a new program in the wake of the decision in *Aguilar*. Therefore, there is nothing to suggest that these entanglements will be continuing now that a program has been implemented.

Plaintiffs also contend that Chapter 1 creates excessive entanglements through the need for administrative cooperation between the public school officials providing the services and the religious school officials receiving them. This contention is more troubling.

To support their position, plaintiffs point out that the *Aguilar* Court stated that: "The administrative cooperation that is required to maintain the educational program at issue here entangles church and state in still another way that infringes interests at the heart of the Establishment Clause. Administrative personnel of the public and parochial school systems must work together in resolving matters related to schedules, classroom assignments, problems that arise in the implementation of the program, requests for additional services, and the dissemination of information regarding the program. Furthermore, the program necessitates 'frequent contacts between the regular and the remedial teachers (or other professionals), in which each side reports on individual student needs, prob-

lems encountered, and results achieved.' "

473 U.S. at 413, 105 S.Ct. at 3238 (quoting *Felton v. Secretary United States Dept. of Educ.*, 739 F.2d 48, 65 (2d Cir.1984)). This language would seem to bar any implementation of Chapter 1 services because any program would require consultation and cooperation between the public and private school officials. Yet, the Court in *Aguilar* did not so hold. Nor did *Aguilar* overrule *Wheeler*, which had implicitly found Chapter 1 constitutional.

What is also surprising, given plaintiffs' great reliance on the quoted passage, is that plaintiffs implicitly admit that they would have no constitutional objections to a program where the parochial school children receive Chapter 1 services in the public schools. But as defendants point out, this would require at least as much, if not greater, cooperation between the religious and private school officials. In fact, the Court can think of no way in which Chapter 1 could be implemented without extensive coordination between the public and parochial school officials. Thus, it would appear that in order for the Court to find the District's implementation of Chapter 1 unconstitutional, the Court would have to find Chapter 1 facially invalid, something that no court, including the Supreme Court, has ever done. This Court, too, declines to take that step.

Therefore, the Court finds that the administrative cooperation needed between public and parochial school officials to implement Chapter 1 does not create excessive entanglements between church and state of a magnitude sufficient to run afoul of the Constitution.

### G.

 Finally, in their complaint, plaintiffs allege that the District "has entered into or authorized the entering into of certain leases with religious organizations which also operate church-affiliated schools where said students receiving Chapter 1 services are enrolled" in violation of the Establishment Clause. Defendants submit that this issue is now moot because the District has not leased any such property since the Fall of 1986, (Camp Declaration at ¶ 14), no leases are currently in effect, (*id.*), and the policy of the District is not to enter into any such leases in the future. *Id.*

Plaintiffs counter by arguing that voluntary cessation of the challenged practice alone does not make the matter moot because the District could at some future time resume the challenged practice. In October 1987, this Court agreed with plaintiffs and denied defendants' motion for summary judgment premised on the same "mootness" argument. In so doing, this Court held that "[i]n light of the possibly impermanent nature of defendants' cancellation of the 'leases,' the continuing possibility for further leases in the future, and the need for further discovery on the issue, defendants' motion for summary judgment is denied." Memorandum Opinion and Order filed Oct. 16, 1987, at 18. Because defendants may at any time resume leasing property from religious officials, unless defendants are willing to stipulate to an order enjoining them from entering into any such leases in the future, the Court denies defendants' motion for summary judgment with respect to the claim arising out of the challenged leases.

### III.

Based on the foregoing,

IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment is DENIED as to plaintiffs' claim that leases entered into between the District and religious organizations are unconstitutional.

2. Defendants' motion for summary judgment is DENIED as to plaintiffs' claim that providing Chapter 1 services in mobile vans located on property owned by religious organizations is unconstitutional.

3. Defendants' motion for summary judgment is GRANTED as to plaintiffs' claim that providing Chapter 1 services in mobile vans parked on public property immediately adjacent to parochial schools is unconstitutional.

4. Defendants' motion for summary judgment is GRANTED with respect to plaintiffs' claim that the "off-the-top" allo-

cation of the costs of purchasing and maintaining the mobile units is unconstitutional.

5. Defendants' motion for summary judgment is GRANTED with respect to plaintiffs' claim that the equal expenditure provision, the by-pass provision and the requirement that the LEA consult with private school officials in implementing any program, give the religious school officials an impermissible "veto" power over the implementation of Chapter 1.

6. Defendants' motion for summary judgment is GRANTED with respect to plaintiffs' claim that the above provisions lead to unconstitutionally excessive entanglements between church and state.