**Imogene C. BARNES, Plaintiff–Appellee, Cross–Appellant (90–5644),**

v.

**Lauro F. CAVAZOS, Secretary of the United States Department of Education, Defendant–Appellant (90–5470/ 5874), Cross–Appellee,**

**Board of Education of Jefferson County, Kentucky; Laken Cosby, Jr.; John P. Heyburn; Jim Hearn; Sherry K. Jelsma; Robert J. Schmitt; Paul Saho; United States Department of Education; Carol A. Haddad; Allen D. Rose; State Board of Elementary and Secondary Education of the Common-**

wealth of Kentucky; John Brock; L. Roger Wells; Robert Mead, CPA; Joseph McPherson; Stephanie Palaisa; D.K. Dumeyer, Sr.; Dr. Thomas C. Kelly, Defendants–Appellants (90–5531), Cross–Appellees,

St. Aloysius School; Christ the King School; St. Columba School; Community Catholic School; St. Denis School; St. George School; Guardian Angel School; Holy Family School; Holy Name School; St. Ignatius School; St. Jerome School; St. Joseph School; Our Lady of Consolation School; Our Lady of Mount Carmel School; Resurrection School; St. Timothy School; St. Vincent DePaul School; West End Catholic School; Commonwealth of Kentucky, Defendants–Appellees,

Marlene Clark; Helen Henning; Bobbie Holloway; Sherryn Roberts; Patricia Smith; Betty Thurman; Steve and Jennifer Hueston; Mary Leitner; Rose Massey; Robin Smith, Intervening Defendants–Appellants (90–5531), Cross–Appellees.

Nos. 90–5470, 90–5531, 90–5644 and 90–5874.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1990.

Decided June 5, 1992.

briefed), U.S. Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., for defendant-appellant cross-appellee Cavazos.

Marc Stern (briefed), New York City, for amicus curiae American Jewish Congress.

Francis J. Mellen, Jr. (briefed), Frank F. Chuppe, Wyatt, Tarrant & Combs, Louisville, Ky., for defendants-appellants cross-appellees Bd. of Educ. of Jefferson County, Ky., Laken Cosby, Jr., John P. Heyburn, Jim Hearn, Sherry K. Jelsma, Robert J. Schmitt, Michael W. Wooden, Carol A. Haddad and Allen D. Rose and defendants-appellants cross-appellees Joseph McPherson and Stephanie Palaisa.

V. Lynne Schroering (briefed), D. Brent Irvin, Asst. Atty. Gen., Office of Atty. Gen. of Ky., Frankfort, Ky., for defendants-appellants cross-appellees State Bd. of Elementary and Secondary Educ. of Com. of Ky., John Brock, L. Rogers Wells, and Robert Mead, CPA.

Charles J. Cronan, IV, Stites & Harbison, Louisville, Ky., Kevin J. Hasson, Charles H. Wilson, Laura P. Masurovsky, Kevin T. Baine (argued and briefed), Williams & Connolly, Washington, D.C., for intervenors-appellants cross-appellees Marlene Clark, Helen Henning, Bobbie Holloway, Sherryn Roberts, Patricia Smith, Betty Thurman, Steve and Jennifer Hueston, Mary Leitner, Rose Massey and Robin Smith.

Lee Boothby (argued and briefed), Berrien Springs, Mich., Nicholas Baker, Louisville, Ky., for plaintiff-appellee cross-appellant Barnes.

T. Jeremy Gunn (briefed), Washington, D.C., for amici curiae Nat. Coalition of Public Educ. and Religious Liberty (Nat. Pearl), Nat. Ass'n of Elementary School Principals, Nat. School Boards Ass'n, Nat. Ass'n of Secondary Schools Principals.

Terry Cushing, Asst. U.S. Atty., Office of U.S. Atty., Louisville, Ky., Michael Jay Singer, Paul W. Bridenhagen, Theodore C. Hirt, Howard S. Scher (argued and briefed), ...

Frank W. Burke, Sr. (briefed), Burke & Burke, Louisville, Ky., for defendants-appellants cross-appellees D.K. Dumeyer, Sr. and Thomas C. Kelly, Dr., and defendants-appellees St. Aloysius School, Christ the King School, St. Columba School, Community Catholic School, St. Denis School, St. George School, Guardian Angel School, Holy Family School, Holy Name School, St. Ignatius School, St. Jerome School, St. Joseph School, Our Lady of Consolation School, Our Lady of Mount Carmel School, Resurrection School, St. Vincent DePaul School and West End Catholic School.

Before: MARTIN and NORRIS, Circuit Judges, and WISEMAN, Chief District Judge.*

PER CURIAM.

The district court determined that the Board of Education of Jefferson County, Kentucky, violated the Establishment Clause of the First Amendment by allocating remedial education funds in disproportionate amounts to parochial students as opposed to public students.[1] The funds were granted to the Board pursuant to Chapter 1 of the Elementary and Secondary Education Act. For the reasons given below, we reverse the district court's decision. We also dismiss plaintiff's cross-appeal because we find it was not timely filed and, therefore, we shall not consider it on the merits.

I.

Chapter 1 of the Elementary and Secondary Education Act authorizes federal financial assistance to local educational agencies for the purpose of providing remedial educational services to educationally-deprived children. The Act is intended to cover those children who come from low-income families residing in low-income areas, regardless of whether or not the child is a public or private school student.[2] Chapter 1 services are usually administered by local educational agencies ["LEAs"] and the LEAs are supervised by a state educational agency ["SEA"].

An LEA applying for a Chapter 1 grant must provide assurance to the Secretary of the United States Department of Education that it will "make provision for services to educationally deprived children attending private ... schools." 20 U.S.C. § 2722(c)(2). In addition, "[e]xpenditures for educational services and arrangements pursuant to this section for educationally deprived children in private schools shall be equal ... to expenditures for children enrolled in the public schools of the [LEA]." 20 U.S.C. § 2727(a).

Imogene Barnes, a taxpayer, filed suit against the defendants in 1980 challenging the constitutionality of sending public school teachers to parochial schools in order to deliver Chapter 1 instruction to students enrolled in those schools. The Supreme Court resolved this issue in *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). In *Felton*, the Court held that New York City's practice of using Chapter 1 funds to pay the salaries of public employees teaching on the premises of parochial schools violated the Establishment Clause. Following the issuance of *Felton*, Barnes moved for summary judgment. The defendants responded to Barnes' motion by asking the district court to grant them time to implement a new program consistent with *Felton*. The district court did not grant or deny this request; nor did the district court rule on Barnes' motion for summary judgment.

After the Supreme Court's decision in *Felton*, the Secretary of the United States Department of Education issued a document entitled "Guidance On *Aguilar v. Felton*," which instructed LEAs to deduct the additional cost of providing Chapter 1 services to private schools from the LEA's total Chapter 1 allocation prior to apportioning funds between public and private school students.[3] The method proposed by

---

* The Honorable Thomas A. Wiseman, Jr., Chief United States District Judge for the Middle District of Tennessee, sitting by designation.

1. Cavazos has since resigned as Secretary of the United States Department of Education and been replaced by Ted Sanders.

2. Effective July 1, 1988, the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 repealed the predecessor to Chapter 1. *See* Pub.L. No. 100–297, 102 Stat. 130 (1988). However, as part of the same legislation, Congress enacted a similar program as Part A of Chapter 1 of Title I, recodified as 20 U.S.C. § 2701 *et seq.*

With respect to the participation of eligible private school children in the Chapter 1 program, the statutory provisions are essentially identical. *Compare* 20 U.S.C. § 3806 (1982) *with* 20 U.S.C. § 2727 (West 1990).

3. As part of the 1988 amendments to the Chapter 1 program, Congress authorized between $30 million and $40 million per year to pay for the capital expenses associated with compliance with *Felton*. Specifically, Congress authorizes the payment of capital expenses "when without such funds, services to private school children would have been or have been reduced or

the Secretary, which is known as the "off-the-top" cost allocation method, was intended to meet the statutory obligation of providing Chapter 1 services on an equitable basis to both public and private school children. In a later publication, the Secretary approved the use of mobile classrooms for delivering Chapter 1 services to private school students, if the mobile units were parked on public property and the funding for the mobile units came off-the-top.

In response to *Felton* and the Secretary's publications, the Board began to lease mobile vans in order to provide Chapter 1 instruction to private school students as well as public school students. Each mobile van could accommodate the administration of educational services to 8 to 10 students. To pay for the vans, the Board used the off-the-top method of allocation, thus deducting the cost of the vans from the total Chapter 1 grant before apportioning the remaining funds for instructional services between public and parochial students. These administrative expenses associated with insuring Chapter 1 services reach qualified private school students without violating the Constitution are referred to as *Felton* costs.

During the 1988–89 school year, the cost of using mobile vans in Jefferson County was $194,181. During this school year, 11,700 students participated in the Chapter 1 program and, of this number, 510 were private school students. Approximately $600 was spent on instructional services per Chapter 1 student. This $600 figure does not include administrative expenses, such as the cost of vans, which were deducted off-the-top prior to allocating Chapter 1 monies between private and parochial students. Although the exact amount of the total Chapter 1 grant for the 1988–1989 year is unavailable, based on the above-delineated information we estimate the grant was approximately $7,214,181.[4]

At the hearing before the district court, Dr. Thomas Fagan of the Department of Education testified about the off-the-top method. Applying the off-the-top method, Fagan explained that the per capita cost of the vans, when averaged over the total number of students governed by the Chapter 1 plan, was only $17 per student; the per capita expenditure for instructional services was approximately $600 per student. However, if the off-the-top method was *not* used—i.e., the Chapter 1 funds were divided up between public and private students in a per capita fashion and, thereafter, the cost of the vans was paid for only with the private students' portion of the funds— quite a different result was reached. Under the latter method, $617 was available for instructional services for each public school student, while only $236 remained available for instructional services for each private school student.

In January 1988, Barnes filed an amended complaint challenging the constitutionality of both the mobile van program and the off-the-top method of allocating funds. Barnes also challenged the practice of sending public school teachers onto the premises of religiously-affiliated institutions for neglected and delinquent children.

The district court entered judgment on February 21, 1990. The court held that the off-the-top allocation formula violated the Establishment Clause because it gave disproportionately more funds to parochial school children than to public school children. The district court held, however, that apart from the method of funding, both the mobile van program and the delivery of Chapter 1 instructional services to institutions for neglected and delinquent children passed constitutional muster.

The defendants filed their notice of appeal on March 23, 1990. On April 30, 1990, Barnes filed a notice of appeal to contest the district court's rulings concerning the constitutionality of the use of mobile vans and the delivery of Chapter 1 services to institutions for neglected and delinquent children. Barnes' notice of appeal, which

would be reduced or adversely affected." 20 U.S.C. § 2727(d)(3).

4. This figure was based on the number of students covered by the plan (11,700) multiplied by the cost of instructional services (about $600). To get the estimated total Chapter 1 funds we add the resulting number ($7,020,000) to the separate cost of providing the vans ($194,181).

was due on April 23, 1990, was a week late. *See* Fed.R.App.P. 4(a)(1). In moving for an extension of time for filing, Barnes' counsel stated that he had miscalculated the time on which the appeal was due and sought to extend the time for filing the notice of appeal. The district court granted his motion, reasoning that the error was "excusable neglect" under Fed.R.App.P. 4(a)(5). This Rule states that "[t]hat district court, upon a showing of excusable neglect ..., may extend the time for filing a notice of appeal upon motion."

■ Defendants contend that we need not address the issues raised by Barnes' cross-appeal because notice of her appeal was not filed within the time required by the federal rules and a late filing under these circumstances cannot be considered excusable neglect. As discussed below, we agree that the district court erred in granting the extension and so we dismiss Barnes' cross-appeal.

The standard for reviewing a district court's order granting an extension of time for filing a notice of appeal is abuse of discretion. *Marsh v. Richardson*, 873 F.2d 129, 130 (6th Cir.1989). In *Marsh*, we found a district court abused its discretion when it granted an extension of time to an attorney who explained that the cause of his delay in filing was that he was unaware of the district court's decision, even though his office had received notice of it. *Id.* The attorney in *Marsh* also attempted to justify his mistake on the grounds that he compounded the initial errors by then incorrectly calculating the time period for filing. *Id.* at 130. In reversing the court's order, we noted that "[i]t is well settled that leave to file an untimely notice of appeal is to be granted only in unique or extraordinary circumstances," and that "the excusable neglect standard has consistently been held to be 'strict,' and can be met only in extraordinary cases." *Id.* We concluded that in light of the attorney's serious lack of diligence and that he essentially committed not simply one mistake but three, the district court erred in granting an extension. *Id.* at 130–131.

Barnes' counsel argues that the district court did not abuse its discretion because, unlike the facts in *Marsh*, he made only one mistake, not three. He argues his tardy notice of appeal is accompanied by a motion to extend the filing time and maintains that this case is more analogous to the circumstances underlying the Third Circuit's decision in *Consolidated Freightways Corp. of Delaware v. Larson*, 827 F.2d 916 (3d Cir.1987). In *Consolidated Freightways*, a five-day delay was occasioned by the appellant mailing his notice of appeal to the Eastern District of Pennsylvania rather than the Middle District. *Id.* at 917. The court of appeals reversed the district court's denial of the appellant's motion to extend the time for filing, reasoning that "excusable neglect" encompassed more than acts, omissions, or events beyond the control of the appellant or the appellant's counsel. *Id.* at 919. The court stated:

This court interprets Rule 4(a)(5) to require a finding of excusable neglect in those instances where the court, after weighing the relevant considerations is satisfied that counsel has exhibited substantial diligence, professional confidence and has acted in good faith to conform his or her conduct in accordance with the rule, but as a result of some minor neglect, compliance was not achieved.

*Id.* at 920.

Here, Barnes' counsel asserts that he exercised substantial diligence by making affirmative efforts to comply with Fed. R.App.P. 4(a)(1). However, the only explanation counsel assigns for not filing notice of appeal on time is that he miscalculated the time requirements of Rule 4(a). Calculating time deadlines in the context of the demands of trial practice is routine and ordinary. "Most trial lawyers know that meeting time deadlines is a part of what their practice is all about." *Marsh*, 873 F.2d at 131. Mistakes arising from such calculations are not of the "unique" or "extraordinary" variety envisioned by our interpretation of Rule 4(a). Indeed, miscalculating the time for filing is among the most ordinary types of neglect. If we were to weaken this circuit's present analy-

sis of Rule 4(a) and hold that the instant circumstances constitute "excusable neglect," the result would be an increase in the manufacture of excuses incapable of our verification. In the absence of unique underlying circumstances that impel a miscalculation, there is no way to verify a lawyer's naked representation that he or she miscalculated time requirements. Because Barnes' counsel has not demonstrated "excusable neglect," we hold that the district court improperly granted an extension of time. We, therefore, dismiss Barnes' cross-appeal.

The effect of our dismissal of the cross-appeal is that the issues raised in the cross-appeal are regarded, for the purposes of defendants' appeals, as correctly resolved by the district court. Accordingly, we turn to analysis of the off-the-top allocation method with the assumption that the mobile van program does not otherwise offend the Constitution. Our only concern is the manner in which the Board disbursed the funds and whether the resulting allocation of funds to private school children violated the Constitution.

The district court found that "the proper test for evaluating off-the-top allocation is whether the cost of providing services to students from parochial schools is 'so grossly disproportionate' to the cost of providing services to students of public schools that the method used confers a direct benefit to sectarian students." The court derived this test from the First Circuit's decision in *Members of Jamestown School Committee v. Schmidt*, 699 F.2d 1, 9–10 (1st Cir.), *cert. denied*, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983). Under the "grossly disproportionate test," a court examines whether the cost of providing services to parochial students is "so grossly disproportionate" to the cost of providing comparable services to public students that the provision of services to the public students is merely a ruse to confer a direct benefit on the church-affiliated private schools. *See Schmidt*, 699 F.2d at 10.

Applying the "grossly disproportionate test" to the facts of this case, the district court concluded that the use of the off-the-top allocation method in the 1988–89 school year reduced the amount of funds available for public students by over $187,000 and, therefore, directly benefited the parochial students at the expense of the public school students. The district court noted that the off-the-top method resulted in only a small per capita reduction in the amount of funds available to each public student ($17 reduction); nonetheless, the court found that the total reduction of more than $187,000 in funds was unconstitutional. In its analysis, the district court put great emphasis on the use of the "grossly disproportionate test" in *Pulido v. Cavazos*, 728 F.Supp. 574, 585 (W.D.Mo.1989), *rev'd*, 934 F.2d 912 (8th Cir.1991). The circuit court in *Pulido*, however, reversed the district court after finding the district court improperly applied the "grossly disproportionate test." 934 F.2d at 912.

We find that the district court's decision to apply the "grossly disproportionate test" was correct. However, we reverse the district court's actual application of the test to the facts. As we discuss below, we find that the court's analysis was fundamentally flawed, resulting in an improper finding of disproportionality.

We begin our analysis with a brief recitation of the legal framework of this Establishment Clause problem. The standard test for an Establishment Clause problem is the three-part test first articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). A statute or governmental action comports with the Establishment Clause of the First Amendment if (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111; *see also County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). Barnes has not placed in issue the "excessive entanglement" prong of the *Lemon* test; therefore, we do not address this issue in our analysis today. In addition,

Barnes' failure to mention a challenge to the *purpose* of the off-the-top allocation method in her amended complaint before the district court renders our consideration of such a challenge inappropriate in this court. As already noted, our sole concern today is the propriety of the off-the-top allocation of funds, which implicates the second prong of *Lemon.*

The *Lemon* test has received criticism from virtually every corner and we add our voices to those who profess confusion and frustration with *Lemon*'s analytical framework. *See, e.g., Harris v. City of Zion,* 927 F.2d 1401, 1419 (7th Cir.1991) (J. Easterbrook, dissenting); *Board of Education of the City of Chicago v. Sanders,* slip op. no. 90–C–3063 (N.D.Ill. May 15, 1991); Chopko, "Religious Access to Public Programs and Governmental Funding," 60 Geo.Wash.L.Rev. 645, 654 (1992) (author calls this the "aptly named *Lemon* test"). However, we find it unnecessary to further cloud the already murky waters of *Lemon* analysis because existing case law addresses the precise issue presented by the instant appeal.

Several courts have specifically addressed the off-the-top method of allocation and found this form of disbursing Chapter 1 funds does not violate the Establishment Clause. *See Pulido,* 934 F.2d at 912; *Schmidt,* 699 F.2d at 1; *Walker v. San Francisco Unified School District,* 761 F.Supp. 1463 (N.D.Cal.1991); *Sanders,* slip op. at 26 n. 14. Some courts have utilized the "grossly disproportionate test" in their analysis; others have indicated that if appropriate facts are ascertainable on review, application of this test is appropriate. *See Schmidt,* 699 F.2d at 9–10 ("grossly disproportionate test" inapplicable because the evidence on cost was incomplete; the court indicated the test would not be inappropriate under other circumstances); *Walker,* at 1472 (*Felton* costs of $368,000 against a total Chapter 1 budget of more than $6,000,000 or 5% was not unconstitutional); *Sanders,* slip op. at 26 n. 14 ("Even if we were to join the other district courts to examine the effects of the provision on services to public school students under the 'grossly disproportionate' analysis, we

would not be quick to find that the disparity clearly flunks the test."). *Compare with Pulido,* 934 F.2d at 926 (cautioning against "comparison of per-pupil expenditures" and finding the district court's application of the "grossly disproportionate test" in striking down of the off-the-top method was improper).

▮ Various principles, which are pertinent to our analysis, are announced in these recent Establishment Clause cases. The Constitution does not require absolute equality of expenditures between parochial and public schools:

> We do not read the "common to all" language [in prior Court analysis] to require absolute equality of access or expenditure, either statewide, taking the busing program as a whole, or district-by-district in each of the program's inter- and intra-district parts. We do, however, read this language to limit the degree of disparity the Constitution will permit.

\* \* \* \* \* \*

> Just as important, the relative costs per-student of sectarian and public student busing must remain roughly proportional.

*Schmidt,* 699 F.2d at 9. *See also Pulido,* 934 F.2d at 925. Indeed, the key concern is that both public and private students receive "comparable services." To properly insure "comparable services" are provided for all students, permissible differences in expenditures will, at times, necessarily result. *Wheeler v. Barnes,* 417 U.S. 402, 421–22, 94 S.Ct. 2274, 2285–86, 41 L.Ed.2d 159 (1974). Such differences might even mean that parochial students will receive more money per capita than public school students because of the legal requirement that both public and private students receive "comparable services." *Barrera v. Wheeler,* 531 F.2d 402, 406–07 (8th Cir. 1976); *see also Schmidt,* 699 F.2d at 10 n. 7. School boards may, of course, exceed constitutional limits in their method of allocating funds. For example, a constitutional violation may occur where the funds or services provided by the school board so benefit the private school students that the

plan is " 'merely a ruse' " to confer such benefits on religiously-affiliated schools. *See Schmidt*, 699 F.2d at 10 (quoting *Springfield School District v. Pennsylvania Department of Education*, 483 Pa. 539, 558, 397 A.2d 1154, 1164 n. 9, *appeal dismissed sub nom. School District of Pittsburgh v. Pennsylvania Department of Education*, 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979)). Also, a constitutional violation may occur where expenditures on behalf of parochial students become "so grossly disproportionate" in comparison to expenditures on behalf of public students that the disproportionateness leads to political divisiveness along religious lines. *Id.* at 10. However, to "render cost differences constitutionally significant, there must not only be divisiveness; the objective disparity must also be palpable." *Id.* at 10 n. 8.

■ Here, the district court found that "it is apparent that use of the off-the-top method for leasing the mobile vans reduces the amount of funds available for public school students by over $187,000." The court concluded that because the off-the-top method of allocation "directly benefits private school students at the expense of public school students," this constituted a violation of the Establishment Clause under the "grossly disproportionate test." Applying the principles we have just discussed, however, we reach a contrary result.

Without question, the statute at issue here is facially neutral—Chapter 1 funds are available to educate both public and private school students. The off-the-top allocation method applies to all administrative expenses, not just those associated with educating private school students. In addition, the 1988–1989 Chapter 1 program in Jefferson County benefitted many more public school children than private school children—11,260 public school children were served as compared to 510 private school children. As we noted above, the precise figure for the total amount of Chapter 1 funds disbursed in the 1988–1989 academic year is unavailable. However, based on other reliable figures found by the district court, we find the maximum amount of funds spent *only* on parochial Chapter 1 students to fund the van-leasing program comprised 2.7% of the total amount of Chapter 1 funds.[5] In other words, public students were deprived of 2.7% of the total amount of Chapter 1 funds which they would otherwise have received were it not for the funding of the van program.[6] We do not consider this

---

5. We agree with the court in *Jamestown*, 699 F.2d at 11, that "[w]ithout precise figures on the relevant costs, the effect of the statute . . . is conjectural." Nonetheless, sufficient figures exist in this case to enable a reliable determination. *See supra* note 5.

$$\frac{\$\ 194,000\ \text{(cost of vans)}}{\$7,214,181\ \text{(total Ch. 1 funds)}} = 2.7\%$$
(% of funds spent on van program)

6. This figure is calculated as follows:

Step No. 1:
$$\frac{510\ \text{(private students)}}{11,190\ \text{(public students)}} = 4.3\%$$
(ratio of private students to public students)

Step No. 2:
Proportion of Chapter 1 = $328,796 (4.3% × $7,214,181)
funds to which private
students are entitled

Proportion of Chapter 1 = $6,885,385
funds to which public    (95.7% × $7,214,181)
students are entitled

small disparity in expenditures between public and parochial students to constitute a constitutional violation under the "grossly disproportionate test." Indeed, in our view this marginal disparity in expenditures was mandated by the requirement that "comparable services" are made available to both public and parochial students. *See Pulido,* 934 F.2d at 912 (statute not unconstitutional merely because it spends more money on parochial students than public students); *Schmidt,* 699 F.2d at 9 (absolute equality of expenditures not required); *Walker,* 761 F.Supp. at 1463 (*Felton* costs at 5% of budget would not be considered a ruse to provide a direct benefit to the parochial schools). Accordingly, we find it inappropriate to invalidate the off-the-top method of allocation under the present circumstances using the "grossly disproportionate test." In reaching our conclusion, we would also emphasize that we are particularly troubled by the district court's ability to reach an opposite result and find "gross disproportionality" when the district court considered only the naked sum of $187,000. Unless the district court *compares* that number to another number, i.e., the total amount of funds under Chapter 1, the district court's use of $187,000 in its analysis is absolutely bereft of any independent legal significance.

Beyond the technical flaws in the district court's holding, we also note two philosophical problems with the court's analysis. First, the district court, as well as Barnes, improperly focuses on the provision of the mobile classrooms as the "benefit" of the Chapter 1 program. Instead, the true benefit of this program is the provision of remedial education services to poor children desperately in need of such services. As the court in *Walker* observed

The mobile classrooms are just a means of providing these services. In fact, if the costs of the mobile units were deducted only from the portion of funds earmarked for children attending parochial schools, those children would be receiving substantially less "educational" services than were the children in the public schools. This would be in violation of Chapter 1 itself, which requires that the services available to children be comparable, a provision explicitly upheld in *Wheeler v. Barrera,* 417 U.S. 402 [94 S.Ct. 2274, 41 L.Ed.2d 159] (1973).

761 F.Supp. at 1471–72. Secondly, we note Barnes' inability to explain how the off-the-top allocation method violates the Establishment Clause when used to fund the lease of mobile vans, but not when used to fund the additional expenses of providing Chapter 1 services to private school students in public school facilities. At oral argument, plaintiff's counsel conceded that providing Chapter 1 services to private school students in public schools would not violate the Establishment Clause. However, just as providing Chapter 1 services in mobile vans requires "non-instructional" or administrative expenditures—*i.e.,* to lease the mobile vans—providing Chapter 1 services to private school students in the public schools also requires administrative expenditures. Indeed, under the latter scenario, public schools might be forced to build additional classrooms and that would, at the very least, result in expenses associated with planning and scheduling. These expenses would be taken off-the-top of the Chapter 1 grant in much the same fashion as similar expenses associated with providing Chapter 1 services to public school students are taken off-the-top.

In summation, we find the Board's off-the-top allocation of Chapter 1 funds consti-

Step No. 3:
$194,000 (cost of vans)
×.9544236 (% of funds allocable to public students)

$ 185,158 = (money taken away from public students that would have been the public students' under a system *not* using an off-the-top method of allocation)

Step No. 4:
$$\frac{185,158}{\$6,885,385} = 2.7\%$$ (proportionate amount of funds spent on vans at public student expense)

tutional. We emphasize, however, that we are not attempting to draw a bright-line rule today by way of utilization of the "grossly disproportional test." At some point a school board's allocation of funds off-the-top might constitute a violation of the Establishment Clause. We will not conjecture at this time, however, the precise point at which such a violation may occur. As the court stated in *Jamestown*, 699 F.2d at 10:

> Short of these limits, we intimate no views. Nor do we suggest a fixed proportion or a dollar or mile limit. [footnote omitted] The balance is as much qualitative as quantitative, and will depend on the facts and circumstances of the case.

Accordingly, we limit our holding that there is no violation of the Establishment Clause to the facts herein.

For the reasons stated above, Barnes' cross-appeal is dismissed and the order of the district court is reversed to the extent that it holds that the off-the-top allocation method applied under the present facts violates the Establishment Clause. The remainder of the district court decision is affirmed.