**BOARD OF EDUCATION OF the CITY OF CHICAGO, Plaintiff–Appellant,**

**v.**

**Lamar ALEXANDER, Secretary of the United States Department of Education, United States Department of Education and Illinois State Board of Education, Defendants–Appellees.**

No. 91–2656.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1992.

Decided Dec. 17, 1992.

quires a local educational agency (LEA) administering the federally funded program to take administrative costs "off-the-top" of the total agency allotment before dividing the funds between public and private schools. *See* 34 C.F.R. § 200.52(a)(2). The appellant, Chicago Board of Education (Chicago Board or Board), submits that the regulation violates both the Chapter 1 mandate for "equal expenditures" and the Establishment Clause of the First Amendment. The district court held the off-the-top allocation to be consistent with both the Chapter 1 statute and the Constitution. We affirm.

# I

## BACKGROUND

### A. *Chapter 1 and its Administration*

Chapter 1 provides federal funds for remedial educational services to educationally deprived children in both public and private schools. Prior to 1985, Chapter 1 instructional services were frequently provided in classrooms in sectarian school buildings. However, in 1985, the Supreme Court held that providing such services in sectarian school buildings violates the Establishment Clause of the First Amendment. *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). Consequently, to provide children attending sectarian schools with the Chapter 1 instruction for which they qualify and to comply with *Felton,* arrangements for other than onsite delivery of services had to be devised. The students either had to be transported to public schools, or mobile classrooms or space outside the sectarian school property had to be leased. The extra costs of transporting the students, renting space, obtaining property insurance, maintaining electricity and general upkeep, which were not necessary when Chapter 1 instruction was provided on-site in the sectarian schools, constitute the so-called *"Felton* costs" at issue in this case.

### B. *The Statute and Regulations at Issue*

Section 2727(a) of Title 20 provides in pertinent part:

Iris E. Sholder, Patricia J. Whitten, Karen Gatsis Anderson (argued), Janet B. Johnson–Vinion, City of Chicago Bd. of Educ., Chicago, IL, David S. Tatel, Patricia A. Brannan, Hogan & Hartson, Washington, DC, for plaintiff-appellant.

Fred Foreman, U.S. Atty., James J. Kubik, Asst. U.S. Atty., Office of the United States Attorney, Chicago, IL, Michael J. Singer, Theodore C. Hirt, Howard S. Scher (argued), Department of Justice, Washington, DC, Mary Ellen Coghlan, and Susan Frederick Rhodes, Asst. Attys. Gen., Office of the Attorney General, Chicago, IL, for defendants-appellees.

Before CUDAHY, COFFEY, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

This case presents a challenge to the implementation of Chapter 1 of Title I of the Elementary and Secondary Education Act (Chapter 1), as amended by 20 U.S.C. §§ 2701–27 (1988). The Act provides federal funding for supplementary educational opportunities for educationally deprived schoolchildren and contains what the district court described as an "equal expenditure mandate" for students in public and private schools based upon the number of children served. Mem. Op. at 14; *see also* 20 U.S.C. § 2727(a). Specifically at issue in this litigation, is a regulation which re-

To the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency shall ... make provisions for including *special educational services and arrangements (such as dual enrollment, educational radio and television, computer equipment and materials, other technology, and mobile educational services and equipment)* in which children can participate. ...

*Expenditures for educational services and arrangements* pursuant to this section *for educationally deprived children in private schools shall be equal* (taking into account the number of children to be served and the special educational needs of such children) *to expenditures for children enrolled in the public schools* of the local educational agency.

20 U.S.C. § 2727(a) (1988) (emphasis supplied).

The Department of Education (Department) is charged with administering Chapter 1 and issues regulations which a participating LEA must follow. Under Department regulations, the "reasonable and necessary administrative costs of providing [Chapter 1] services to public and private

schoolchildren" are to be deducted off-the-top of a LEA's entire allocation before determining what equal expenditures entail. 34 C.F.R. § 200.52(a)(2) (1992). The Department defines *Felton* costs as "administrative costs" and thus insists that they be deducted off-the-top.[1] Additionally, following *Felton*, Congress appropriated extra federal funds to be used specifically to cover "capital expenses"[2] incurred in administering Chapter 1 in compliance with *Felton*. 20 U.S.C. § 2727(d)(3).[3] However, the amount appropriated is not sufficient to cover all *Felton* costs.

## C. The Present Litigation

The current dispute arose when the Chicago Board applied for Chapter 1 funds for the 1989–1990 school year. The Board decided not to deduct *Felton* costs off-the-top. Instead, it determined that *Felton* costs only benefitted sectarian schoolchildren and should be counted as part of the equal share of funding to which the sectarian schoolchildren were entitled. The Illinois State Board of Education advised the Chicago Board that its application would not be approved because it failed to comply with the off-the-top allocation formula adopted by the Secretary. In order to avoid forfeiture of all Chapter 1 funds, the Chicago Board resubmitted its application for funding in compliance with the off-the-

1. The Department guidelines were codified in May 1989, in 34 C.F.R. § 200.52(a)(2), which provides:

> (2) Before determining equal expenditures under paragraph (a)(1) of this section, an LEA shall pay for reasonable and necessary administrative costs of providing services to public and private school children, including special capital expenses defined in Section 200.-57(a)(2), from the LEA's whole allocation of funds under this part.

2. Section 200.57(a)(2) defines "capital expenses" as:

> expenditures for noninstructional goods and services that are incurred as a result of implementation of alternative delivery systems to comply with the requirements of *Aguilar v. Felton.* These expenditures
> (i) Include—
> (A) The purchase, lease, and renovation of real and personal property (including but not limited to mobile educational units and leasing of rental sites or space);

> (B) Insurance and maintenance costs;
> (C) Transportation; and
> (D) Other comparable goods and services;
> (ii) Do *not include the purchase of instructional equipment such as computers.*
>
> 34 C.F.R. § 200.57(a)(2) (1989).

3. Section 2727(d)(3) provides:

> (3) There is authorized to be appropriated $30,000,000 for fiscal year 1988, $40,000,000 for fiscal year 1989, and such sums as may be necessary for each of the fiscal years 1990, 1991, 1992, and 1993. Any sums appropriated under this provision shall be used for increased capital expenses paid from funds under Chapter 1 of the Educational Consolidation and Improvement Act or this section subsequent to July 1, 1985, of local educational agencies in providing the instructional services required ... when without such funds, services to private schoolchildren would have been reduced or would be reduced or adversely affected.

top formula. A similar chain of events occurred with respect to the 1990–1991 school year funding.

The Chicago Board filed this lawsuit alleging that the effect of the off-the-top mandate was to reduce the Chapter 1 funds available to public school students by $433,251 for the 1989–1990 school year. As a result, the Board claims 1,064 fewer public school students received services funded by Chapter 1.[4] The Secretary responded to the Board's assertions by claiming that public school students were not actually denied access to or "bumped" from Chapter 1 programs. According to the Secretary, the actual effect of the regulation was to reduce the per capita expenditure for all entitled children by $5.74 per child in the 1989–1990 school year.

## D. District Court Proceedings

In a detailed and comprehensive opinion, the district court, noting that it owed considerable deference to an executive department's interpretation of a statute that it is charged to administer, concluded that 20 U.S.C. § 2727(a) could be construed reasonably to require that all "administrative costs," including *"Felton"* costs, be taken "off-the-top" and that the congressional mandate for equality of services be computed solely on the basis of instructional services.

As a starting point in its statutory analysis, the district court concluded that the statutory language was susceptible to more than one interpretation. The court determined, however, that the long-standing interpretation of the Secretary was supported by the legislative history. The district court was especially persuaded in this regard by those portions of the legislative history that evidenced a congressional intent that students enrolled in private school programs receive comparable benefits with their counterparts in the public

educational system.[5] Moreover, noted the district court, a contrary interpretation would lead to a significant frustration of the manifest congressional intent that all students be afforded an equal opportunity to benefit from the funds.

The district court then turned to the Chicago Board's constitutional challenge grounded in the Establishment Clause of the First Amendment. Applying the test first articulated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the district court determined that all the traditional prongs of that test were met. First, the court rejected the Chicago Board's argument that the statute as interpreted by the Secretary does not have a secular purpose because it benefits only the sectarian schools and, in the process, hurts the children enrolled in the public schools. In the district court's view, the statute served the secular purpose of providing remedial aid, in equal measure, to all children, without regard to the school of their enrollment. The court noted that it could perceive no endorsement or disapproval of religion in the statutory scheme.

Second, the district court did not discern any primary effect of advancing or inhibiting religion. Candidly recognizing that this case does not fall neatly into any of the factual scenarios presented in previous Establishment Clause cases, the district court began its analysis by inquiring whether the regulation was facially neutral. Relying on *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the district court concluded that, while, as a practical matter, this particular class of administrative costs (*i.e., Felton* costs) was advantageous to the sectarian school students, the regulation was facially neutral and, unlike the situations in *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), and *Estate of*

---

4. The Board also submitted that $468,400 less in Chapter 1 funds were available to public school students in the 1990–1991 school year, resulting in at least 360 fewer public school students receiving the supplemental services.

5. H.Rep. No. 1137, 95th Cong., 2d Sess. 32–33 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4971, 5002–03 (equal expenditure requirement was to "insure that children enrolled in private and secondary elementary schools will receive *comparable benefits* from programs authorized by [Chapter 1]") (emphasis supplied).

*Thornton v. Caldor, Inc.*, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), presents no obvious risk of advancing the religious mission of the schools. Indeed, noted the district court, the Chicago Board makes no argument that the funds will be channelled into impermissible sectarian activities.

Finally, the district court held that the challenged regulation did not run afoul of the third prong of the *Lemon* test, the so-called "entanglement" prong. The court noted that the funding at issue did not involve a direct subsidy to a religious institution, the usual situation which produces entanglement concerns. *See Mueller*, 463 U.S. at 403 n. 11, 103 S.Ct. at 3071 n. 11. Moreover, continued the district court, the "off-the-top" provision here is an internal accounting procedure and, in its view, did not present the potential for the "political strife" along religious lines usually associated with the entanglement concept. On the basis of this analysis, the district court granted summary judgment for the defendants.

## II

## ANALYSIS

At the heart of the parties' dispute is a disagreement over what Congress intended by the terms "equal expenditures" in § 2727(a) and "equitable services" in § 2727(b)(2). Essentially, the Chicago Board claims that Chapter 1 requires a LEA to spend an equal overall dollar amount upon private and public schoolchildren (per capita). That bottom-line dollar amount ought to include, in the Board's view, the cost of compliance with *Felton*. In contrast, the Department claims that Chapter 1 mandates that an equal amount of actual *instructional educational* benefits be allocated to each child within the district, regardless of the child's enrollment in private or public school.

In its brief before this court, the Chicago Board presents this challenge to the off-the-top regulation in two basic legal arguments. First, the Board contends that the regulation is invalid as a matter of statutory interpretation because it violates the

delegating statute's requirement that funds be equally spent upon children of both public and private schools. Under the Board's analysis, to comply with the statute, *Felton* costs must be deducted exclusively from the portion of funds allocated to private schools *after* the funds are divided. Additionally, the Board contends that the regulation violates the Establishment Clause of the First Amendment because it has the impermissible purpose and effect of advancing religion. We shall address these arguments in turn. Like the district court, we shall address the statutory issue first. *See Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (if a case can be decided on either constitutional or statutory grounds, the court will decide only the latter).

A. *Education Consolidation and Improvement Act*

■ Our review of a statutory scheme whose administration is committed to an agency of government is circumscribed by the mandate of *Chevron U.S.A., Incorporated v. Natural Resources Defense Council, Incorporated*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron*, the Supreme Court set forth the now common two-step analysis for examining an agency's interpretation of a statute:

First, always is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). Thus our first inquiry is

whether § 2727(a) speaks clearly to the issue of *Felton* costs. If it does, then our statutory analysis is complete and we must adopt the construction chosen by Congress. Alternatively, if we determine that Congress has not clearly indicated its intent, then we must decide whether the Department's construction is *permissible*.[6] For the convenience of the reader, we set out once again the most relevant part of section 2727(a) of Title 20:

> To the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency shall ... make provisions for including special educational services and arrangements (such as dual enrollment, educational radio and television, computer equipment and materials, other technology, and mobile educational services and equipment) in which children can participate....
>
> Expenditures for educational services and arrangements pursuant to this section for educationally deprived children in private schools shall be equal (taking into account the number of children to be served and the special educational needs of such children) to expenditures for children enrolled in the public schools of the local educational agency.

20 U.S.C. § 2727(a) (1988).

In interpreting this statutory text, the Chicago Board submits that the measure of equality for public and private school students is the term "educational services and arrangements." In the Board's view, this term, more precisely the word "arrangements," clearly covers *Felton* costs. In contrast, the Secretary takes the view that the term "educational" modifies both "services" and "arrangements." Under this view, the "arrangements" that enter into the equal expenditures calculus are only those arrangements that are educational in nature. The Secretary also urges that the

"equal expenditures" mandate must be read in conjunction with the statute as a whole. In this regard, he notes that section 2727(b) requires that both public and private schoolchildren participate in the program on an "equitable basis." This congressional mandate, when read in light of the Supreme Court's holding in *Wheeler v. Barrera*, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), requires, in the view of the Secretary, that the amount of expenditures available to all children for *educational* purposes be roughly the same. *Wheeler* interpreted Chapter 1, he points out, as requiring that the educational opportunities available under the statute be qualitatively and quantitatively comparable for all students regardless of the institution of their enrollment. *Id.* at 415, 420–21, 94 S.Ct. at 2282, 2284–85 (1974). This goal could not be achieved if the costs of compliance with *Felton* were charged only to the funds designated for the educational support of children attending sectarian schools. Such an arrangement, the Secretary continues, would impose an unfair burden upon the children who attend those schools.

Finally, the Secretary submits that his reading of the statute is the correct one because the statute also contains a separate section, section 2727(d), that authorizes the expenditure of funds for capital expenditures associated with the costs of complying with *Felton*'s mandate. Congress' inclusion of this section within the statute, submits the Secretary, demonstrates that it considered compliance costs to be *non-educational* costs and therefore not part of the equal expenditures mandate of the statute.

While we believe that there is a great deal of force in the textual and structural analysis of the statute tendered by the Secretary, we cannot conclude that the intent of Congress is unambiguously expressed on the face of the statute. There-

---

**6.** *See also Unemployment Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946) ("To sustain the Commissioner's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached."); *The National Assoc. for the Advancement of Colored People v. American Family Mut. Ins. Co.,* 978 F.2d 287 (7th Cir.1992) (same).

fore, following the mandate of *Chevron*, we must determine whether the Secretary, as the executive officer charged with the administration of the statute, has given the statute a reasonable construction.[7] As we have just noted, we believe that the Secretary's rendition of the text and his analysis go a long way toward ascertaining the intent of Congress with respect to the allocation of these compliance costs. The reasonableness of this interpretation is further supported by the legislative history that clearly manifests an intent that all recipients, regardless of the institution of their enrollment, be treated equally with respect to instructional opportunities.[8] We note that this emphasis on equal instructional opportunities by the Secretary is a longstanding one that has withstood the passage of many congressional sessions without a serious legislative suggestion that it is in error.[9] Moreover, compliance costs—costs incurred by a government agency to ensure that *it* does not violate the Constitution—hardly fit comfortably within the concept of *educational* benefits. As our colleagues in the Sixth Circuit have recently recognized in *Barnes v. Cavazos*, 966 F.2d 1056 (6th Cir.1992), it is inappropriate to regard the provision of neutral classrooms as the "benefit" of the Chapter 1 program.

> Instead, the true benefit of this program is the provision of remedial education services to poor children desperately in need of such services....

*Id.* at 1065. Quoting an earlier district court opinion, it continued:

The mobile classrooms are just a means of providing these services. In fact, if the costs of the mobile units were deducted only from the portion of funds earmarked for children attending parochial schools, those children would be receiving substantially less "educational" services than were the children in the public schools. This would be in violation of Chapter 1 itself, which requires that the services available to children be comparable, a provision explicitly upheld in *Wheeler v. Barrera*, 417 U.S. 402 [94 S.Ct. 2274, 41 L.Ed.2d 159] (1974).

*Id.* (quoting *Walker v. San Francisco Unified School Dist.*, 761 F.Supp. 1463, 1471–72 (N.D.Cal.1991)).

The Board argues that the Supreme Court's holding in *Wheeler* actually supports its assertion that *Felton* costs are arrangements under the Chapter 1 mandate for equal expenditures. The Board reaches this conclusion from the Court's grouping of both "equipment and instruction" as "educational services and arrangements." However, the costs considered in *Wheeler* were costs which all schools—private and public—necessarily bear to achieve the institution's educational mission. Thus, there would be no reason not to allocate them to their respective ultimate beneficiaries in keeping with the goal of achieving equal educational opportunity; the amount of money spent upon equipment and instruction would be directly reflected in actual supplementary education. In contrast, the costs associated with main-

---

**7.** *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82; *see also Jones v. Director*, 977 F.2d 1106 (7th Cir.1992) (applying *Chevron* analysis); *Alabama Tissue Ctr. of the Univ. of Ala. Health Serv. Found. v. Sullivan*, 975 F.2d 373, 377 (7th Cir. 1992) (same).

**8.** Title I funds have always been intended to reach eligible pupils in nonpublic as well as public schools. However, NIE's research on Title I indicates children in nonpublic schools may not be adequately served by Title I programs.... The addition of this equal expenditure requirement is intended by the Committee to insure that children enrolled in private elementary and secondary schools will receive comparable benefits from programs authorized by Title I according to the standard presently required by current regula-

tions and approved by the United States Supreme Court in its decision of June 10, 1974 (*Wheeler v. Barrera*).

H.Rep. No. 1137, 95th Cong., 2d Sess. 32–33 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4971, 5002–03.

**9.** *See Haig v. Agee*, 453 U.S. 280, 297–98, 101 S.Ct. 2766, 2776–77, 69 L.Ed.2d 640 (1981) (absent evidence of congressional intent to repeal administration interpretation, Court concluded Congress adopted "longstanding administrative construction"); *Flood v. Kuhn*, 407 U.S. 258, 273–74, 92 S.Ct. 2099, 2107–08, 32 L.Ed.2d 728 (1972) (congressional inaction may evidence acquiescence); *Zemel v. Rusk*, 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278–79, 14 L.Ed.2d 179 (1965) (same).

taining a neutral site for sectarian students bear no relation to the actual amount of educational benefits received. A more natural reading of the "equal benefits" language adopted in *Wheeler* supports taking *Felton* costs off-the-top. Accordingly, under the deferential standard set forth in *Chevron*, we must conclude that the Secretary was not unreasonable in determining that *Felton* costs be deducted off-the-top.

**B.** *Establishment Clause of the First Amendment*

Our resolution of the statutory issue requires that we now address the constitutional issue presented by the Chicago Board. The Board contends that the Secretary's regulation is constitutionally infirm because *Felton* costs exclusively benefit sectarian school students. Consequently, because there are not sufficient Title I funds to provide supplemental educational services to all qualified schoolchildren, any allocation to sectarian school students necessarily reduces the funds available for public schoolchildren. The context in which this Establishment Clause challenge arises is somewhat unusual. However, we believe that it nevertheless presents a situation that is susceptible to resolution through the traditional approach to such issues.

■ To pass muster under the Establishment Clause, a statute or other government action must: 1) have a secular purpose, 2) neither advance nor inhibit religion as its primary effect, and 3) not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971); *Harris v. City of Zion*, 927 F.2d 1401, 1411 (7th Cir.1991) (applying the "now familiar three prong" *Lemon* test),

*cert. denied,* —— U.S. ——, 112 S.Ct. 3054, 120 L.Ed.2d 920 (1992). The Chicago Board maintains that this scheme both lacks a secular purpose and has the primary effect of benefiting sectarian students.[10] Because the Board has not argued on appeal that the regulation involves an excessive entanglement of government with religion, we shall address only the first two prongs of *Lemon*.[11]

1. Secular purpose

■ The Chicago Board contends that the off-the-top regulation was a direct response to the Secretary of Education's dissatisfaction with the *Felton* decision and thus had a secular purpose from its inception. The regulation lacks a sectarian purpose, in the Board's view, because it benefits only sectarian school students and disproportionately hurts public school students. In reply, the Secretary argues that the regulation is neutral on its face and simply attempts to ensure the congressional mandate of affording benefits of the program to all disadvantaged students.

In evaluating these submissions, we find much with which we can agree in the Chicago Board's statement of the guiding legal principles. As the Board notes in its brief, the first prong of the *Lemon* test is aimed "at preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987). "'The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion.'" *Edwards v. Aguillard*, 482 U.S. 578, 585, 107 S.Ct. 2573,

---

**10.** Although this question is one of first impression for this court, both the Sixth and Eighth Circuits have recently addressed the constitutionality of this precise regulation. As did our colleagues on these circuits, we conclude that the regulation requiring that *Felton* costs be taken off-the-top of a local education agency's Chapter 1 fund allocation does not run afoul of the Establishment Clause of the First Amendment. *Barnes v. Cavazos*, 966 F.2d 1056 (6th Cir.1992); *Pulido v. Cavazos*, 934 F.2d 912 (8th

Cir.1991); *see also Walker v. San Francisco Unified School Dist.*, 761 F.Supp. 1463 (N.D.Cal. 1991) (deciding on summary judgement that "off-the-top" regulation is constitutional).

**11.** Although not necessary to today's disposition, we note that, were we confronted with a question of excessive entanglement, neither our analysis nor our outcome would change.

2578, 96 L.Ed.2d 510 (1987) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)).

We have substantial difficulty, however, with the Chicago Board's application of these principles to the case before us. We cannot accept the argument that the regulation lacks a secular purpose. In issuing the regulation, the Secretary specifically noted that the regulation was designed to harmonize the mandate of the Supreme Court in *Felton* and the mandate of the Congress for equal educational opportunity.[12] Certainly, the random comments of the Secretary in the wake of *Felton,* critical of its holding, cannot fairly be characterized as evidencing an intention to do anything other than ensure that the mandate of the Congress continue to be fulfilled. There simply is no basis in the record for the argument that the regulation was designed to give sectarian schools or their students an advantage over their public school counterparts. Therefore we cannot accept that the regulation's purpose is to "endorse or disapprove religion." *Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987).

### 2. Primary effect neither advances nor inhibits religion

■ The Chicago Board also submits that the regulation violates the second prong of the *Lemon* test because it has the primary effect of benefiting sectarian school students at the expense of students enrolled in the public schools. Because of this effect, continues the Board, the regulation has the primary effect of advancing

religion. In its view, the district court erroneously characterized the regulation as neutral and therefore controlled by the reasoning of *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). Rather, submits the Board, this case is controlled by *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 15, 109 S.Ct. 890, 899, 103 L.Ed.2d 1 (1989), in which the Supreme Court struck down a state tax exemption that applied only to religious publications.[13] The Board also relies upon the holding of the Court in *Estate of Thornton v. Caldor,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985). In that case, the Court held unconstitutional a law that required employers to permit workers to refrain from work on their Sabbath. The Court determined in that case that the statute under review commanded that religious concerns take precedence over all other competing concerns in the workplace, regardless of the nature of those competing interests. Placing such unyielding weight on religious concerns, held the Court, has the primary effect of advancing religion. The funding at issue here must similarly fall, concludes the Chicago Board, because its "effect is all in the direction of benefit for sectarian schools at the cost of elimination of important Chapter 1 services for hundreds of public school students." Appellant's Br. at 34.

The Secretary disputes that the funds at issue can be characterized as a subsidy of religion. Relying principally on *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the Secretary notes that the funds made available under the

---

12. Particularly since *Aguilar v. Felton,* the administrative costs of providing educational services to private school children have become greater than the costs of providing such services to public school children. If these costs were deducted solely from the portion of the LEA's Chapter 1 funds designated to provide services to private school children, the remaining funds would not be sufficient to provide equitable instructional services to those children, thus defeating the purpose of the statutory provision.
. 54 Fed.Reg. 21,800 (1989).

13. In declaring the Texas statute unconstitutional, the Supreme Court wrote:

[W]hen government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion ... it "provide[s] unjustifiable awards of assistance to religious organizations" and cannot but "conve[y] a message of endorsement" to slighted members of the community.

*Bullock,* 489 U.S. at 15, 109 S.Ct. at 899–900 (quoting *Amos,* 483 U.S. at 348, 107 S.Ct. at 2874 (O'Connor, J., concurring)).

regulation are administered by the Board acting as the LEA. Nor are the funds used, notes the Secretary, for anything other than a secular activity. The instructional programs are secular in nature and the governing statute requires that the funds not be used to supplant educational services that the secular schools are providing or would provide in the absence of Chapter 1 financing. Therefore, the Board, acting as the LEA, is prohibited from using the funds in a way that would reduce the funds sectarian schools spend on education so as to increase the funds available for religious programs. Moreover, he notes, the mobile classrooms and other similar devices purchased with the funds are used for the delivery of Chapter 1 instructional services; they are put to no sectarian use. The Secretary submits that this case is governed by *Mueller*. He points out that, in *Mueller*, the Supreme Court upheld a tuition tax credit plan that afforded a credit for all elementary and secondary school tuition, even though the overwhelming benefit might well be to parents of students enrolled in sectarian schools. Here also, submits the Secretary, the court need not go beyond the facial neutrality of the regulation. He continues, the overall Chapter 1 program benefits all students. The fact that it is more costly to deliver those services to some students does not render the program suspect.

█ In evaluating the arguments of both parties, we believe that *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), provides an appropriate starting point for our analysis. The Supreme Court, in an opinion written by Justice Powell, articulated a two-prong approach for assessing primary effect:

Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting.

*Id.* at 743, 93 S.Ct. at 2343. *See also Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct.

2562, 101 L.Ed.2d 520 (1988); *Roemer v. Board of Public Works*, 426 U.S. 736, 752–55, 96 S.Ct. 2337, 2347–49, 49 L.Ed.2d 179 (1976) (plurality opinion). Under this approach, the first inquiry is whether the government funding flows directly to a sectarian institution. We believe that this issue can be resolved without great difficulty; the funds at issue are administered by the LEA, a public agency. *Felton* costs, as all Chapter 1 administrative costs, are handled by the Board, acting as the LEA. Thus, the regulation poses no problem under the first prong of the *Hunt* approach.

The second prong of the *Hunt* approach requires that we determine whether funds are being channeled to "a specifically religious activity in an otherwise substantially secular setting." *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2343. At the outset, we think it is important to keep in mind that the statutory scheme of Chapter 1 is aimed at providing certain special educational services to all students of the district. The Supreme Court has already made clear that the provision of those services, the ultimate activity that *Felton* costs can be said to support, are secular. *See Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). Moreover, as the Secretary points out, Chapter 1 specifically prohibits the use of Chapter 1 funds to supplant educational services which the sectarian schools were already providing, or would provide, in the absence of Chapter 1 funding. 20 U.S.C. § 2728(b); 34 C.F.R. §§ 200.44, 200.53(a) & (b). Thus it is clear that the primary effect of the statute and the regulation is not to advance any of the sectarian institution's goals. Instead, the effect is to supplement the basic education of educationally deprived children, without regard to their parents' choice of school system.

█ The Board correctly notes that the delivery of these services to children enrolled in the public schools entails no *Felton* costs. However, we do not believe that disparity in costs in the delivery of constitutionally permissible services renders the program unconstitutional. As the Secretary suggests, the Supreme Court's decision in *Mueller*, while not identical in

all respects, is helpful to our analysis. There, the Court specifically rejected the argument that a greater overall expenditure on private schoolchildren creates a per se violation of the First Amendment. *Mueller*, 463 U.S. at 402, 103 S.Ct. at 3070. Indeed, as the Secretary also suggests, the constitutionality of the regulation is even more obvious here than in *Mueller*. The costs of compliance with *Felton* are only one of many operational costs necessary to get the services provided by Chapter 1 to the designated recipients.[14] Indeed, contrary to the suggestion of the Chicago Board, there is no special fund designated solely for the students of sectarian schools. The cost of compliance with *Felton* is hardly a cost attributable to the children whose parents have exercised their constitutional right to send their child to a sectarian institution. *See Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925). Rather, it is a *compliance* cost, in all likelihood one of many, designed to ensure that the LEA, in the delivery of the programs contemplated by Chapter 1, does not step over the con-

straints placed upon it by the First Amendment's Establishment Clause.

■ When government action is facially neutral, the inquiry into whether its primary effect is to advance or inhibit religion ought not be a complex, statistically-based analysis. As were the district court in this case and the Eighth Circuit in *Pulido*, we are unable to accept the proposition that the constitutional validity of a program ought to turn on complex and transitory statistical analyses.[15] In *Mueller*, the Supreme Court upheld a tax deduction for the costs of educating dependent minors. The petitioners in *Mueller* argued that, because public schools are tuition free, the deduction is only available for private school tuition. They further presented statistics showing that ninety-six percent of the children in private schools attended religiously affiliated schools. 463 U.S. at 401, 103 S.Ct. at 3070. In rejecting the petitioners' claim that this evidenced a primary effect of benefiting religion the Court stated:

> We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports recit-

14. As a compliance cost to enforce the separation of public educational authority and religious educational institutions, this allotment hardly constitutes a symbolic union of church and state. *See Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 380, 105 S.Ct. 3216, 3220, 87 L.Ed.2d 267 (1985) (important concern of Establishment Clause jurisprudence is whether the "symbolic union" of church and state is "sufficiently likely" to be perceived as either an endorsement or disapproval of individual religious choices).

15. In analyzing the "primary effect" of the off-the-top regulation, the Sixth Circuit employed the so-called *"Schmidt"* analysis and looked to see if the regulation created a "grossly disproportional" disparity in expenditures between public and parochial schools, such "that the provision of services to the public students is merely a ruse to confer a direct benefit on the church-affiliated private schools." *Barnes v. Cavazos*, 966 F.2d 1056, 1062 (6th Cir.1992) (citing *Members of Jamestown School Comm. v. Schmidt*, 699 F.2d 1, 9–10 (1st Cir.), *cert. denied*, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983)). In *Barnes*, the court scrutinized the total LEA allocation, the actual *Felton* costs, and the ratio of private school to public school students. The court then calculated what it considered to be the proportion of Chapter 1 funds

each group of students was "entitled" to and compared that figure to the allocation resulting using the *off-the-top regulation*. From this complex calculus, the court concluded that the maximum decrease in public school funding which could have resulted from the *Felton* costs at issue was 2.7%. *Id.* at 1064 n. 5. While explicitly not determining whether a more extreme discrepancy in funding would violate the Establishment Clause, the court merely held that a 2.7% discrepancy was not "grossly disproportionate." *Id.* at 1064–65.

In contrast to the Sixth Circuit's approach, the Eighth Circuit expressly held that it was error to use the *Schmidt* test as an analytical framework for addressing the constitutionality of the off-the-top regulation. *Pulido v. Cavazos*, 934 F.2d 912, 926 (8th Cir.1991). In *Pulido*, the court instead chose to analyze the regulation as facially neutral. We find the Eighth Circuit approach more realistic, and similarly decline the opportunity to engage in complex number crunching. However, we note with approval the district court's comment that a *Schmidt* analysis would not help the Board's current case. Even if we accept the Board's contention that we should be looking at the total dollars spent implementing Chapter 1 without distinguishing instructional from noninstructional benefits, the "disparity" upheld in *Schmidt* was far more extreme than in this case.

ing the extent to which various classes of private citizens claimed benefits under the law. Such an approach would scarcely provide the certainty that this field stands in need of, nor can we perceive principled standards by which such statistical evidence might be evaluated.

*Id.*

Congress has mandated that all children be afforded the opportunity to participate in the educational opportunities available under Chapter 1. In delivering those programs, the Chicago Board, as the responsible LEA, must serve all the children within its jurisdiction. In doing so, it will incur some costs in complying with various constitutional and statutory mandates, including the Establishment Clause. Those costs are the responsibility of the program, not of the children who are the recipients of the program. For these reasons, we cannot accept the argument that the regulation at issue violates the Establishment Clause.

## CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED.